Good morning, Your Honor. May it please the Court, I'm Kevin McEwen, Counsel for the California Attorney General and the California Parties. Mr. Heineke, Counsel for the City of Seattle, and I will be sharing time this morning. It's our intent, we understand we have to keep our own time, but it's our intent that I'll take the first eight minutes, he'll take the next six, we'll each reserve three for rebuttal. Mr. Heineke is addressing the excluded evidence issue, and I will be addressing the Mobile Sierra issue. This is not a Mobile Sierra case. Could you move the microphone just a little bit closer to you? Thank you. Is that better, Your Honor? Much better, thank you. That's too better. This is not a Mobile Sierra case. In a Mobile Sierra case, the contract comes first, and the complaint comes after. That's why in Morgan Stanley, the Supreme Court referred to buyer's remorse. But here, the complaint came first, before any of the contracts. And that distinction makes all the difference. Well, a complaint came first, but what was it that came first? Your Honor, it was the complaint filed in this case, and it was directed against... By whom? Puget. But it was directed against all sellers, market-based rate tariffs who were selling in the Pacific Northwest. When did your client join? In August of 2001, Your Honor. And how does that fit in the sequence? It didn't come first. When did it come? Your Honor, the complaint was pending. A complaint was pending. A complaint against all sellers selling at market-based rates. When was your complaint pending? Your Honor, we didn't file a complaint. We joined the case. So your complaint did not come first. You joined the case at some point later in time. I mean, if you emphasize what comes first, it's worth figuring out what is it that actually came first. Well, Your Honor, the point I want to make is that all sellers in the Pacific Northwest, as of December 25, 2000... But they didn't know that your client had filed any complaint. What Puget asked for in the complaint was a cap on rates that any seller in the Pacific Northwest could charge under the seller's market-based rate tariff and under the WSPP agreement if they were selling in the Pacific Northwest. And that covered every sale in the Pacific Northwest. And the refund effective date was December 25, 2000. So as of December 25, 2000, every seller in the Pacific Northwest was on notice that the rates charged under their market-based rate tariffs and the WSPP agreement were subject to refund. Yet the sellers here in this case went ahead and took the risk and made sales at market-based rates,  This court's already addressed the issues that you raised back in the Port of Seattle case in 2007 when there were all kinds of procedural arguments about when the state joined the case and the fact that the complaint had been dismissed in December of 2000 because there were requests for a rehearing pending. The court dealt with all those procedural issues, including the inclusion of CSRS, and decided that CSRS could be in the case. That's the state. Decided that all the procedural arguments about whether claims could be made under this complaint were already resolved. Because of the Mobile Sierra presumption, simply because of this set of facts that the complaint was pending at the time every one of these contracts was entered into, the Mobile Sierra presumption just doesn't come into play. There's no basis for anyone to presume. I don't really understand your legal basis for that argument except to say that that's what happened. Chronologically in Mobile Sierra, is that your argument? Your Honor, the argument is that the complaint was pending at the time the sales were made, not the reverse. I understand that, but I'm asking for your support for that argument as to why you think that's the only circumstance in which Mobile Sierra could be applied. Your Honor, and that is Firk's argument. Firk's argument is I don't know, I'm asking you for what's your best answer to that argument. My best answer to that argument is that under 206 of the Federal Power Act, if a complaint is pending and a refund effective date has passed, every sale made subject to the complaint is subject to refund. And that's exactly what Firk does all the time when it deals with 206 complaints. And why does that speak to what the just and reasonable standard is in this context, which is what I understand the Mobile Sierra doctrine speaks to as clarified by Morgan Stanley. It says it's the application of the same just and reasonable standard in the context of where two parties have contracted. And why does the fact that there's a complaint pending change the fact that two parties have contracted here? Because you can't presume that a rate is just and reasonable if a complaint is pending, a refund effective date has passed. The parties made their contract. They made their contract presumably knowing the complaint was pending, and yet they meant the contract to mean something. Well, on the buyer's side, it means that, and the seller, the seller was on notice that any sale he made under his market-based rate tariff or under the WSPP agreement was subject to refund. And that's exactly what Firk does all the time. Both parties knew that, and yet they entered into a contract at a given price. Why shouldn't we read Morgan Stanley to say that price is presumed to be just and reasonable? Your Honor, because Morgan Stanley didn't deal with the circumstance. Morgan Stanley and all of the other Mobile Sierra jurisprudence Well, that's Judge McEwen's question. Why is Morgan Stanley not applicable to this? Is it simply because the protest was on file? And if so, what's the authority that supports that proposition? Well, I'll give you an example of what Firk does all the time. Is there any authority that supports that proposition? Your Honor, I would say that there's no authority that supports the reverse proposition. In other words But is there any authority that supports your proposition? That's what we're trying to understand. It may be that there is, in any end, this would be the first case to make that determination, and if that's so, perhaps you can tell us, but Your Honor, we would say that the Westar case, which we cite in our brief, which is a D.C. Circuit case, addresses precisely this situation. The Mobile Sierra issue was not framed in the way it's framed in this case, but the facts of that case are identical to the facts of this case. What happened was Westar filed its triennial update for its market-based rate authority. Firk looked at it, decided to initiate a 206 complaint proceeding, initiated the proceeding, set a refund effective date. After the refund effective date passed, Firk ultimately made the determination that certain sales that Westar had made were not just and reasonable under the ordinary standard. Well, can I ask you two questions about Westar? One, I didn't think Mobile Sierra was referenced there, and two, if I recall correctly, that was a tariff case, correct? Well, Your Honor, this is a tariff case as well. Oh, it's a contract case. The complaint in this case was directed against the sellers' market-based rate tariffs. That's footnote one of the complaint, and it's... Well, doesn't that just read Morgan Stanley out of the law, if you're trying to call them all the same? Your Honor, our position is that Mobile Sierra has never applied in this situation. It's never been applied in this situation. Well, how about my question? Morgan Stanley applied the Mobile Sierra doctrine to contractual agreements. Now, they were arguably under tariffs, but that doesn't make them tariff cases. The point of Morgan Stanley was that if parties have contracted, you look to the contract, and you presume that contract price to be just and reasonable. Now, you're basically waving it away, aren't you, by saying, well, they're all tariff cases, so Westar applies. Westar doesn't trump Morgan Stanley. Well, the D.C. Circuit's decision came after Morgan Stanley. I certainly agree with you that it doesn't trump Morgan Stanley. Can you talk about Morgan Stanley or Mobile Sierra? Westar raised the issue in front of FERC, said... And again, in fairness, it's not squarely, squarely raised, but Westar... What about the decision? I'm sorry. Did the decision... The decision gave reasoning. It's essentially Mobile Sierra reasoning. It said the sellers were on notice. Westar complains, shouldn't have to pay refunds. And the court said that argument's a nonstarter because the sellers were on notice. Westar was on notice that there was a complaint pending that there was a refund effective date, and any sales it made after that time were subject to refunds. So Westar has to pay refunds. Westar did raise to FERC, in a request for rehearing, the argument that Mobile Sierra-related cases should prevent Westar from paying refunds. FERC said that doesn't apply here, which is precisely my point. FERC, in every one of these cases, looks at, files its own complaint, initiates a 206 proceeding. Before the contracts are entered, the seller nonetheless goes ahead and negotiates contracts. In Westar, they were under the WSPP agreement. The seller negotiates the contracts. FERC makes a determination that the rates charged were not just and reasonable. It requires the seller to pay refunds. It's just the way FERC has done it. In Westar, it does it in the WSPP case, which every contract there is under our contract. Can you give a straight answer to my question? I can look it up later. Whether there's authority? No. You didn't really answer that. You basically said there's not. There's flip authority. My other question, more precisely, was whether Westar actually relied on and cited Mobile Sierra or Morgan Stanley. It did not. It did mention Morgan Stanley, but it didn't cite it for this proposition. Okay. Thank you. You're down to a little under nine minutes. Do you want to? I'll just quickly go to the second part of the argument and then turn it over to Mr. Heinke. And we'll stand on our brief on this issue. The second reason that it makes a difference that the contract was entered after the complaint was filed is that Section 38 of the WSPP agreement in this context works as a Memphis clause. So when you read Section 38, you see that an amendment that is unilaterally filed under Section 38 is applicable only to new transactions entered into after the effective date of the amendment. That's precisely this case. What unilateral power is there to change in the agreement that applies here? It didn't appear unilateral to me. And FERC appears to have held it not unilateral. Again, Your Honor, the complaint was pending. Again, every single case that FERC relies on, even this Court's decision in the case that this Court extended. Well, how does the fact that a complaint was pending affect whether the contractual term permits a unilateral change to the terms? That response strikes me as entirely nonresponsive. Why does the fact that a complaint is pending make this a Memphis clause? Because the request in the complaint was to change the tariff. Well, that didn't give either party unilaterally the right to change the tariff. You had the protest on file asking FERC to change the tariff, but that seems to be an entirely different creature. That doesn't explain why this is a Memphis clause, does it? Yes, it does, Your Honor, because in this context, the complaint triggers the procedure in Section 38. Section 38 only deals with amendments to the tariffs going forward from the refund effective date or from the effective date of the amendment. By whom? Amendments by whom? The party who files the complaint. I don't know if you or your colleague will address it, but that has to do with the issue of jurisdiction. And I'm interested to know whether our somewhat flexible rule on whether we can take jurisdiction on certain issues that have been definitively resolved, whether you know if this has ever been applied in the Mobile Sierra context. Your Honor, when you say jurisdiction, do you mean appealability? Yes, jurisdiction to be here right now. You argued the merits of Mobile Sierra, but you kind of slid over jurisdiction, which, of course, we'd have to get to before we could talk about it. Right, so my response, and I'll try to do it quickly because my time is running down and I'm taking Mr. Heineke's time. But under steamboaters, there are three prongs. The first prong is finality. FERC's decisions on these two points, the point I just argued and the point that Mr. Heineke is going to argue, are final. They're never going to change their minds on this. We asked for rehearing. They denied rehearing. They just issued an opinion 537. They've reconfirmed what they said there. This is a final decision. It's legal in nature, so you're not invading FERC's province when you take this question up or these two questions up. And finally, the irreparable harm part of steamboaters is satisfied here because under all those cases, the Court, as you say, Your Honor, is sort of flexibly looking at what the situation is. And what we have here is that FERC's use of the mobile CR standard in this case has resulted in a very elaborate hearing that we've had to address issues that are completely irrelevant if the correct standard were used. If the just and reasonable standard were used in this case, it would be all the difference. And none of what we did below and are continuing to do and may have to continue to do for decades before we get back to this Court was unnecessary. Let me just clarify because I want to make sure we understand because let's say that we take jurisdiction and then let's just hypothetically say we agree with your analysis of mobile Sierra. In your view, would that essentially wipe out the proceedings that we've already had and there would need to be a new proceeding or would the existing evidence be applied to a just and reasonable standard without regard to mobile Sierra or what would be the practical consequence? Well, when it goes back to FERC, FERC will have to decide the just and reasonable rate. To do that, we would say it's very easy. We don't know what FERC exactly is going to do, but we would say it's very easy to do. FERC just needs to come up with a price that reflects a proxy price that approximates what the price in the market should have been under the fundamentals in the market. We already have exactly that here for the CERS transactions that we're talking about because FERC has already mitigated these very, very same power sales. When CERS bought the power from sellers, CERS resold it at no cost or at no markup to the ISO and FERC mitigated those sales down to the MMCP. So we would say that it goes back to FERC. I'm sorry. The question was whether or not you anticipated new evidentiary hearings or whether or not you simply apply mobile Sierra differently in the context of the existing evidence. Would you take away the presumption and apply it to the existing evidence, come up with the rate or new evidence? Your Honor, I'm sorry. Your Honor, the existing evidence deals with two issues. It deals with trying to avoid the mobile Sierra presumption because of bad conduct or trying to overcome it because of excessive burden. Neither of those issues are really relevant in determining the just and reasonable rate. That was my point. That's why this Court has jurisdiction because prudentially the burden is so heavy to go through a mobile Sierra hearing. Okay. Let me ask another question. I realize you're getting out of time, but we have to really understand this. I understand, Your Honor. We take jurisdiction, but we don't accept your proposition on mobile Sierra and say that they've made a final decision on that, but that we agree with FERC on the mobile Sierra invocation of it. There would still be minor remand for other evidentiary matters that came out of the last order. Would that be the next round? Well, now we are getting into Mr. Heinke's realm, and he'll talk about the excluded evidence, but that's exactly what would happen. If you agree with FERC and send it back and say, FERC excluded these various pods of evidence that should have been considered, then FERC is going to have to somehow work that into a new hearing or some procedure to allow for that evidence to be considered. Okay. Thank you, Your Honor. Would you put six minutes on the clock? You wanted six minutes? Is that what you wanted? Yes. Let's see if I've got that close enough so everybody can hear. My name is Rex Heinke. I'm here on behalf of the City of Seattle. The issues that I wanted to cover are the evidence that FERC excluded, that is, if you assume that the Mobile Sierra Doctrine does apply here, then was FERC correct when it excluded a great deal of our evidence from being put on in front of the ALJ? Now let me ask you a procedural question that really just follows up on the question I asked Mr. McKeon. If we were to say that the Mobile Sierra Doctrine applies, but we were to disagree with you as to whether we should take jurisdiction over various evidentiary issues, what then would be the procedural posture when the case went back to FERC? I guess I'm not clear on what evidentiary issues you're referring to. The ones you have. Let's just say we decide not to take jurisdiction over your appeal on that point, on the issues you're about to argue. But we said Mobile Sierra was appropriately invoked in principle. What then would happen? I want to be clear about what you mean when you say invoked in principle. There are really three different things that I think we've raised about Mobile Sierra. The first one is what Mr. McKeon has talked about, which I'll call Mobile Sierra doesn't apply on its face, for example, because of 206 or because of a Memphis clause. The second way to conclude Mobile Sierra doesn't apply is to find illegal manipulation of the market. And there, I think there's complete agreement that that's a basis for what we've said in the briefs, avoiding Mobile Sierra. But there we say we weren't allowed to put on our evidence to prove that. And the third way, of course, to overcome it is to show that the public interest standard has been met. And again, we submit that we were not allowed to put on all of our evidence to meet those two things. The evidence I'm talking about doesn't. Because I understand that then what you will address are really items two and three, correct? Exactly. Okay, so now let me ask you to assume that the on its face argument is rejected and we were to determine that the procedure for, I don't know what you want to call it, invoking Mobile Sierra is not improper on its face. Then, of course, you are in the position of saying, but then we have appropriate evidence that we want to rebut it. But let's just say we drew the line in this appeal on the on its face issue. Then what would happen? Well, I'm afraid we would submit that that would make proceeding below then not very useful because we'd still be stuck with the rulings that say we can't put on the evidence that we believe will show illegal market manipulation and will show that we've met the public interest standard. But why don't you have the opportunity then to seek review of that at the conclusion of the case? Well, we did seek review of it in our petition for rehearing at the outset because that was a ruling at the outset. So we were obliged then to seek rehearing or be barred from raising that. So we sought rehearing. FERC said, no, we're not going to change those rulings. So we brought them here because, as Mr. McKeown was saying, in our view these rulings are final. That is, there's nothing more if we go back as to these rulings that's going to happen. FERC is not going to change its position on those particular rulings. So they should be decided now. If we prevail on them, then it changes, of course, what needs to be done in front of FERC. If we don't, then, well, we don't. But we submit that we should have an opportunity to put in that evidence and that there's no reason to delay a decision on those issues because, first, there's been enormous delay here, but there's nothing that's going to be done differently, so why not resolve those issues now? They're here. They've been fully briefed. They're finally decided. They're important to the outcome of the proceedings below. There's really no reason to delay at this point. Well, the problem, you know, that you can, although I grant you in administrative agency cases it's different, but you can make the same argument in every case that the court has made a ruling or the agency has made a ruling, they're not going to change their mind. That seems to me doesn't get you finality in the sense that we're used to finality. Well, I agree with you. Looking at this case, if I looked at it as a regular piece of civil litigation, I think I would conclude that it wasn't final. But it seems to me that agency cases don't work in the same way. At least if you read the case law, they do not seem to work in the same way. This seems to be one where it's not really final in the sense of a civil judgment after a jury trial, that kind of finality. The same thing is certainly true of this court's decision in the city of Fremont, where essentially the court said, well, we're going to decide this now, because if we don't and if we send it back, then there's a good prospect that it will never get here because of the practicalities of it. So do you characterize what I'll call issues two and three as you laid out, do you characterize those then as legal determinations as to the admissibility of that evidence to rebut the Mobile Sierra presumption? Yes. As Mr. McEwen was saying, they're final for it's not going to change its mind. They do not, we submit, invade the province of the agency because they're pure legal issues. We're not talking about some discretionary question. They're either right or wrong on that issue. And on the question of the injury by not going forward, if you look at the city of Fremont, we are similarly positioned that as a practical matter, these things are going, if you make us go back, it's going to be injurious. It's going to lead to much greater delay in these proceedings, which have already been long delayed. So I think if you look at the three factors here that this court has used in trying to determine finality, it makes sense to go ahead and rule on these issues now. Well, if we ruled in your favor, and there's also, they're already, by the FERC order, there's going to be a remand on some portion anyway, right? If we ruled in your favor, then what would happen? Well, then we would go back and we would put on this evidence that we, for example, all the evidence about the reporting violations and the evidence about market manipulation to demonstrate either that the market was manipulated and therefore mobile CR does not apply, or in the alternative, even if that's not true, that we have met the public interest standard. But sending us back now, I submit, is essentially a futile act, because FERC's not going to change its rulings. We're not going to be able to put on this evidence, so there's not going to be a different outcome before the ALJ or before FERC, and then we'll be back here, except that will be years down the line. I don't see how that in any way advances a fair resolution of this case for anyone. So if we ruled against you, for example, then basically the initial decision that the commission ruled on in May would, by your view, essentially become a final decision? Yes. You still have some remand issues. Right, and there's remand issues there. When that's over, we would petition for rehearing in front of FERC, of course, to say that the ALJ's determinations were incorrect, and the current ones are incorrect. We are in the process of preparing a rehearing petition as to the May decision, and I'm sure if we prevail, FERC is going to bring that to this court, and if they prevail, we are going to bring that to this court. I just want to make sure I understood, though. If we were to disagree with you as to whether a legal error was made on these evidentiary issues, I thought I heard you say, okay, well, you go back because there's some remand anyway in the order. Yes. But if we were to disagree with you, would those issues then come back up again through FERC, or would it be over? No, I think it would come back up. Then why would we want to rule on it now if it would be able to be subject to review? Well, because the reason I said you want to rule on it now is if we aren't allowed to put in this evidence and you've ruled, okay, we can't put the evidence in, that's one thing, okay? But if you don't rule on it now, we go back, we have the remand, we then go to FERC again, we then come to this court again, and then this court says yes or no on letting the evidence in. If this court says, yo, that evidence should have been in, we're back to an ALJ again for another hearing. My question was, what if we did rule on it now, but we ruled against you? I thought that I, and this is why I want to clarify, I thought I heard you say, well, of course we have some remand issues anyway, and then we'd come back up and we would again, in effect, relitigate this issue of whether that evidence should have come in. No, no, not if the court's already ruled on it. I'm sorry, I misspoke. So if we ruled against you, that would be over? That would be over. Okay, I'm just trying to understand. But if the court ruled, didn't rule, then we go back through this whole proceeding in front of FERC on the remand, and then we come back here, we go to FERC again, and then we come back here. And then you find out the answer. Right, no, I understand your judicial and administrative economy point, but because this applies to other cases, the jurisdictional aspect is important. I understand, but I think if you put together all the three factors that this court has used before, there's not, the way I understand the test, it's not a bright-line test as you must meet one, you must meet two, and you must meet three, so much as we look at the three factors holistically to decide whether, as a practical, sensible matter of judicial administration, there is sufficient finality that whatever the ruling is, is appealable to this court. Our questions have taken you over your time, and I've got another one. Is there an offer of proof procedure in the administrative hearing comparable to what we'd have in court, such that we know what the body of evidence that you proposed to submit but were not able to would consist of? I don't believe so, but, yeah, I don't believe so. There was a reference in one of the briefs, I think it may have been TransCanada's brief, a reference someplace to evidence actually being admitted with regard to the bad faith issue. I think it, for some reason Utah is sticking in my head, I take it some contract is under Utah law. I don't think, I thought FERC, my understanding is the other way around, that FERC ruled that it would not decide those kinds of issues because they were state law issues. So you're not aware that such evidence has been admitted? I don't believe. Okay. Very good. Thank you. Thank you. May it please the court, Lona Perry for the commission, and I would like to cede six minutes of my time to the interveners in support of respondents. I'd like to address that last point first, if I may, just so I don't forget about it. With regard to the bad faith evidence and whether it had come in or not, it is in fact the case that at hearing the commission, the ALJ admitted evidence of bad faith obligations under state law in order to support the, in support of arguments that there was not a valid contract, the traditional grounds of contract abrogation, fraud, duress, bad faith, in support of that. And because Morgan Stanley said that the commission could set aside contracts and not apply the Mobile Sierra presumption in those circumstances, the commission did allow that evidence in. And you can see that actually in the order on initial decision that I submitted by 28-J letter that the commission just issued several weeks ago. At paragraph 142, the commission discusses the fact that the ALJ properly admitted this evidence of bad faith for this purpose and also talks about the fact that its original order in this case could be misread to have precluded the admission of such evidence, but it actually is relevant to the issue of whether there is a valid contract and so whether the Mobile Sierra presumption applies. So this is an example of the finality issue, in particular with regard to the evidentiary issues, because as things played out at hearing, things that you might think were final holdings in these decisions actually didn't turn out to be what you might have expected. For example, with respect to the bad faith, you could read paragraph 25 of the rehearing order in the commission's orders at issue here to say that bad faith would be excluded, but it wasn't in fact excluded at hearing and they were allowed to put in that evidence. Similarly, one of the categories of evidence that they talked about was non-party conduct, whether they could put in evidence of bad actions by non-parties to the contract and whether that's relevant to the Mobile Sierra inquiry. And the commission said in these orders that it wasn't relevant to the issue of whether they could avoid Mobile Sierra, in other words, whether there was a valid contract or not, but at hearing they were permitted to put in the evidence of non-party bad conduct in support of their arguments on the excessive burden that it violated the public interest. And you can see that in the order on initial decision, again, with the 28-J letter. It's at paragraph 216, and that's in support of footnote 4 of Morgan Stanley, which permits them to argue that manipulation by non-parties to the contract is relevant to whether or not there's an excessive burden on consumers. So as you see, things have played out differently in the hearing than you might imagine from just reading the orders that are before you, which goes to the issue of it really is not ripe for review by the court at this time. Perhaps, but I think there is a practical point that if the issue is sufficiently joined at this juncture, we don't decide it, then we're going to be back here in another three or four years hearing the same arguments. True? With regard to the evidentiary arguments, Your Honor, I mean, as I was just saying, some of these arguments, as it turned out at the hearing, they were allowed to put in the evidence that they are now complaining is being excluded. Yes, for different purposes. And so some of the arguments may fall out. What about Mobile Sierra, though? The argument they started with on its face, they say it's just not applicable, and the Commission has taken the position consistently through the proceedings that it is applicable, and then, of course, they have this duty to figure out whether they could rebut the presumption. But why shouldn't we at least take jurisdiction over that so that you know it's like a binary switch, isn't it? It either is or it isn't going to be in a vote. And the Commission's position has always been the same. That's right, Your Honor. I would just direct your attention when you were asking about whether there is a finality case that discusses Mobile Sierra, I would direct your attention to the Papago case, which this Court relied on, and the scheme voters. And in that case, Papago was talking about finality in the context, in the flip side context, if you will, where a party says that the Commission should reject a rape filing because it's contrary to a contract. It's contrary to Mobile Sierra. And the Commission denies that and lets the rape filing go forward to hearing. And Papago said there are three reasons why that decision would be final, denying the Mobile Sierra claim and letting the rape filing go forward. And that's because the Mobile Sierra would not be at issue in the subsequent rape filing hearing. And the Court had all relevant information to the Mobile Sierra issue before it at the time already. And there would be irreparable injury because in that case, the person who has the contract is losing their contractual right to that rape during the pendency of the agency proceedings. And there's no mechanism for giving that back to them. Let's just say we took jurisdiction and we ruled that Mobile Sierra is applicable. We didn't rule whether the presumption has been rebutted, but we were to rule in effect that on its face it's applicable. If that's the case, then the proceeding basically continues as it has, correct? Yes, Your Honor, that's right. And if we were to rule the opposite, then of course that would change the whole shape of what the case is about, correct? Yes, Your Honor, it would be a different inquiry then. So it's kind of baffling to me that at least on the question of the facial issue of yes or no, whether Mobile Sierra can be applicable, it's odd to me that under Steamboaters, Propago, and our other cases that the Commission wouldn't want to know the answer to that. Well, and certainly, Your Honor, we believe that the answer is very simply laid out in Morgan Stanley. But that actually wasn't in the Ninth Circuit, so wouldn't you want to know the answer from the Ninth Circuit in this case, whether this binary thing is a yes or a no going forward on this narrow legal issue of Mobile Sierra? Yes, Your Honor, we're happy if the court finds it sufficiently final and you want to make a ruling on the simple threshold issue of are these the kinds of contracts to which Mobile Sierra applies. Certainly, we felt obligated to raise the issue. I mean, there were certainly finality concerns. It's like your brief goes this way, but as a practical matter, I couldn't understand why your head wouldn't go the other way. So that's what I'm trying to unscramble here. And so you're basically saying the Commission would not be opposed to jurisdiction on that, but then, of course, I think your next sentence was, but we don't have the same view on the evidence, on the evidentiary issues, right? Right, Your Honor. I just don't think that on the face of these orders, given how things have progressed at the hearing and how things have changed, that there is enough for you to really rule on the evidentiary issues. But on the threshold issue, it's purely a question of law, and the Commission's not going to change its mind. Would you agree with that? That's right, Your Honor. And we do think it's entirely controlled by Morgan Stanley. And it is. Morgan Stanley clearly directs that the Commission is required to apply the presumption of reasonableness to contracts that are, to bilateral contracts that are freely negotiated. And it clearly says we can only abrogate contracts in the public interest. And it clearly says CIERA defines what it means for the rates to be just and reasonable, and therefore the fact that there's a complaint pending which puts people on notice of just and reasonable rates, the public interest is the applicable just and reasonable standard in the contract context. And Morgan Stanley was very clear that it applies the same way regardless of when the complaint is filed. At 545, they make the point that in rejecting the prerequisite of initial review of the contract, they make the point that it doesn't matter when you challenge the contract. It's the public interest standard is the applicable just and reasonable standard. And I would like to address, too, while we're on this subject, the Westar case, which was discussed earlier. The thing that differentiates Westar from this case is that in Westar, what was at issue was their authority to enter into market-based rate contracts. They filed a tariff with the Commission that would allow them to make market-based rate contracts, and the Commission rejected that filing. And so what the Commission was ordering was refunds from the difference between the market-based rates that they contracted for and the cost-based tariff rates that they were allowed to charge in areas where their market power was not mitigated. And so what the Commission was saying, essentially, was you have to refund for these contracts because you didn't have authority to enter into them in the first place. So this goes more to the it's not a valid contract as opposed to we're giving refunds for an unjust and unreasonable rate. They didn't have authority to enter into market-based rate contracts to start off with. And that's what differentiates Westar from this case. Oh, I'm sorry. I have gone over the time that I meant to reserve. I have a few more questions. Okay. I don't want to foreclose them. No, I understand. We'll sort it out. So on the evidentiary issues, they put these into two boxes, whether they should be able to introduce evidence on illegal manipulation and also on the public interest. And they say basically they're foreclosed from that, you know, it basically ties their hands up in trying to rebut the Mobile Sierra presumption. If they're correct on being foreclosed at this stage on that, why wouldn't that be a legal ruling that also would basically be final and they should have an answer on that so that everybody knows what the shape of the table is going back? Well, see, Your Honor, that seems to me to be kind of an extraordinary argument because, for example, in the remand order at paragraphs 18 and 19, which is in the California Party's excerpts of record at 33 to 34, the commission said you can put in evidence of market manipulation. You can put in evidence of terror violations. You can put in evidence of the gaming and anomalous behavior, all of those sorts of categories. They put in enormous amounts of evidence in at hearing about market manipulation, about market power. So which remand are you looking at, the 2013, the 2015, or one before that? The one under review in this case, Your Honor. It's the California excerpts of record at 33 to 34. It's paragraphs 18 and 19, and that's where the commission is talking about the kinds of evidence of manipulation and market power that the parties are allowed to put in. But they put in considerable evidence on those issues at hearing, so I'm perplexed by the argument that they're precluded from putting in evidence on those issues. If it's specific to reporting violations, if that's the evidence that we're talking about, In these orders, the commission said that the reporting violations are not relevant to the question of avoiding Mobile Sierra, because it doesn't by itself prove anything about whether there was market manipulation that was causally related to the contract rate, which is what Morgan Stanley required. And with regard to public interest, with regard to the public interest standard, all these orders say on their face is on the rehearing order, paragraph 27, which is the California parties' excerpts of records at 13, it says we will allow people to put in any relevant evidence on the question of the public interest. Now, as it happens, at the hearing, evidence of the reporting violations hasn't been allowed. But that's what has transpired at the hearing, and that's what's now being discussed in the orders on the rehearing, the ALJ's initial decision, the order on initial decision. But these orders, all they say about the public interest, that is the only holding, which is you can put in any evidence that's relevant on that issue. And so in review of these orders, it's very difficult to say there's anything wrong with that holding, which is you can put in any relevant evidence. So that's, again — Could you differ on what you consider relevant evidence to be? Yes, Your Honor, but I'm saying the commission in these orders didn't opine on that issue, whether or not the reporting violations were relevant evidence on the issue of the public interest. And they have — that evidence has been excluded at hearing, but the commission has no — you know, and these orders doesn't discuss the issue with respect to the public interest at all. They only discuss — I guess that even — let me just say if it went back and we didn't decide that and then it comes back, I take it then, even if we thought that was error, we'd still be looking at it against substantial evidence and the ultimate decision and not necessarily the micro-components of the evidentiary rulings. Would that be the correct standard? Yes, Your Honor. With regard to an issue you touched upon before, I don't think I understood what you were saying. And this has to do with the argument largely made in the opening comments by petitioners that there was a protest, a complaint already pending during this whole period of time. Why shouldn't that affect the application of Mobile Sierra? Because the parties knew at that time there was the possibility of the commission, based on that complaint, acting to find the rates not just and reasonable. Well, because, Your Honor, Morgan Stanley specifies that the just and reasonable standard that applies to contracts is the public interest standard. And so the fact that the parties were on notice that the just and reasonable standard would be applied doesn't change the analysis because that standard is the public interest standard. And again, at page 545, Morgan Stanley is very clear that it doesn't matter when the contract is challenged, that the public interest standard still applies. It always is. It applies the same way. The just and reasonable standard in the context of contracts is the public interest standard. And so the commission's view is, under Morgan Stanley, there's no other option but to apply the public interest standard to these contracts. Has the commission ever awarded relief in the face of a Mobile Sierra presumption? Yes, they have, Your Honor. I have a few cases I can cite for you, if you would like. Why don't you provide them on a citation list to the clerk afterwards? Certainly. Any further questions? Okay. May it please the Court, Kenneth Wiseman for the California Respondents, TransCanada and Shell. And I would ask for three minutes. I want to address this question of what evidence was permitted into the record and be a little bit more specific about it because I think it's important to correct the record. FERC's orders, first of all, placed limitations on only three categories of evidence. And, in fact, during the evidentiary hearing, the Cal Parties were permitted to put in evidence in two of those categories, and they weren't detrimentally impacted whatsoever by the inability to put evidence in on the third. First, they claim they were prevented from presenting testimony that sellers violated obligations of good faith and fair dealing under Utah law. In fact, one of their witnesses provided 300 pages of prepared testimony and 120 exhibits to support his allegations that TransCanada, Coral, and one other party engaged in bad faith. The Cal Parties, TransCanada, and Coral all briefed to the ALJ and to the Commission the question of what law was controlling and what standards ought to apply in determining whether the contracts that were formulated between the parties and CSRS were formulated under bad faith. In the FERC's decision just about three weeks ago, FERC acknowledged that it did not permit evidence in concerning good faith obligations under state law, but it was very specific that it did allow evidence on bad faith and it ruled that Utah law was controlling it including all the testimony that was provided under Utah law with respect to its interpretation of bad faith. So it simply is not true that they were not permitted to put in that evidence. They also claim they weren't permitted to put in evidence concerning the bad acts or misconduct of third parties. In fact, one of their witnesses sponsored 12 exhibits consisting of almost 1,000 pages of materials that reflected allegations and findings of misconduct by 20 entities and individuals who were unaffiliated with TransCanada or Coral and nothing whatsoever to do with either of these companies. The third category concerns the reporting violations. As you know, those have been considered in Lockyer, but I want to point out one more item on that. The commission ruled that if the Cal Parties could prove that a seller engaged in market manipulation or exercised market power, then it was superfluous whether they also engaged in or had deficient quarterly reports. It just follows intuitively that if the Cal Parties could not prove that a seller engaged in market manipulation or exercised market power, then allegations of reporting violations were irrelevant. And that's, I've used my three minutes. All right. Thank you. Thank you. We'll give you five minutes for rebuttal. Oh, I'm sorry. How much time do you need? I apologize. I reserve three minutes. I don't think I'll need three minutes.  Thank you very much, Your Honor. I'm going to use it all. Believe me. Your Honor, John Longstreth for the Seattle Respondents. And I really only wanted to address a couple short issues because there have been a lot of people up here before me. With respect to the Mobile Sierra issue, I think where FERC is, I think if the court wants to consider that issue, I think it's a question of law. We don't think it's a particularly close question. We've laid it out in the briefs, the arguments. They're not supported by any precedent or any logic. What I did want to raise was the question that I think Judge McKeown, in particular, was getting into about the evidentiary proceedings. We do think that it might be a little awkward for the court to try to decide issues of what FERC did or didn't allow without having the record of what was actually allowed at the hearing. And I did want to correct on one thing. You know, in Seattle's brief, for example, they allege that the remand orders did not allow them to provide for issues of whether the market was functional and competitive, whether supply and demand contributed to the price rises or whether there was evidence of lawlessness. That is absolutely untrue. All of that came in at the hearing. I was there. I saw it. There were findings based on voluminous testimony that the market was functional and competitive, that supply and demand functions were responsible for the prices. And most importantly, Seattle had every opportunity to put in any evidence it wanted to, that any of the sellers violated the law, violated their tariffs, engaged in acts of market manipulation. Seattle did not put on any such evidence, and the judge found that. So I really urge the court, again, you know, whether you get into that issue or not, you really have to understand what the record shows. Seattle did not put in that evidence. The only thing that the commission did exclude was evidence of reporting violations, and that was solely on the basis that they would be superfluous because the claim was that reporting violations would mask market manipulation or the accumulation or exercise of market power. Since Seattle had every opportunity to show that directly, the commission said why should we add on evidence of reporting violations? You can show that directly. And they did have every opportunity to show that directly. So why isn't that sufficiently final and concrete for us to assume jurisdiction over it? I do believe you could decide the issue as to whether FERC was correct in arguing that the reporting violations would be superfluous given their direct opportunity to show it. The record will show, in fact, also that they had every opportunity to show it and did not. Is there any factual doubt with regard to reporting violations? I'm sorry, any? Is there any factual doubt with regard to the truth or falsity of the claim that reporting was not made? Oh, absolutely, Your Honor. And I would just very briefly, with respect to my client, any problems with reporting violations. You know, you go back to the first lock, your case, and there's this discussion about rampant reporting violations. With respect to my client, any violations, I think when California put it forward first, they didn't even allege any reporting violations for one of the periods of time against my client. For some, what they did allege, they were, you know, minor things that maybe we aggregated some sales. But, for example, in our case, we reported every sale. We reported every price. And, of course, people knew the prices. You know, you didn't need reporting to know what price you were buying at. So, certainly, if, in fact, reporting were put into the case, we would put on a very vigorous defense that any reporting violations, even apart from their lack of any causal relationship to any harm they suffered, were just not substantial violations, if they were violations at all. So we would certainly put that on if, in fact, the court were to say they should put that on. But we think Berg's absolutely correct that that's all irrelevant anyway, because they had the chance to show that directly. In terms of practicality and jurisdiction, I mean, if this case comes here three or four years from now, we say, well, we do think the reporting violations were relevant. Then you have to start all over again. So why wouldn't you want the answer now? As I said, I do think that you probably could decide this superfluidity question. Is that a word? Whether they were superfluous, you could decide that. Whether it was a matter of logic, if they could show it directly, would it add anything to add reporting violations? That you probably could decide, assuming that they had the chance to show it. Having the record would convince you that they actually showed it. Would you decide that solely as a matter of law, or would you have to determine what else was available that would, in effect, mimic in some ways the underpinnings of a reporting violation as to why there was a violation? In other words, is it a stand-alone legal question, or does it relate to the evidence actually admitted? I think probably the best way to answer that question is if you look at, and again, as a side, Seattle didn't even raise any reporting until we were ten years into the case, to FERC anyway. But the argument with respect to reporting was always that the reporting violations masked the exercise of market power and masked this market manipulation activity. FERC said, assuming that is true, if you can show that directly, it would just be unnecessary and superfluous to also show the reporting violations. That, it seems to me, is true as a matter of logic, and the court could find that, or hold that, I'm sorry. Okay. Thank you. Ready for Buttle? Five minutes. We'll put on. Thank you, Your Honor. I would just like to address first the Westar case, and briefly. Counsel for FERC talked about Westar as a tariff-filing case, and that Westar didn't have a market-based rate tariff, and it filed one, and that that was the context in which the 206 proceeding arose. But I think if you read the FERC case line of cases carefully, what you see is that Westar had a market-based rate tariff, had it for a while, one of the conditions of having such a tariff is to file a triennial market power update, which Westar did. And when Westar did that, by happenstance, it also included in a tariff filing some other conditions that FERC, as a result of a recent rulemaking, wanted companies to put into their tariffs. So it did that. But what FERC went after when it initiated the 206 proceeding was not that. It was the fact that Westar had tripped the market power screen that FERC had instituted, essentially, after the Lockyer proceeding. It's sort of the way it worked out. But in any event, so FERC initiated this proceeding against Westar's existing market-based rate tariff, and ultimately set a refund effective date and said, in these types of sales that you're making in this part of your area where you serve, we think you have market power. We're putting anything you do subject to refund. If you enter into contracts after this point, they're subject to refund. And Westar went ahead and did it. There's functionally no difference between what happened in Westar and what happens in every similar case that FERC does than this case. The complaint is filed. When FERC, under 206 of the Federal Power Act, when FERC initiates a proceeding, it's essentially filing a complaint. But there's no distinction in the law between a private party filing a complaint like Puget or FERC initiating a 206 proceeding. They both initiate the proceeding. A refund effective date is set. Things are then sort of in limbo once the refund effective date is set. The rates are conditional. And what FERC does in every single one of these cases is set a refund effective date and then investigate, and if it investigates and finds that there's market power or that the rates that have been charged in the interim are not just unreasonable, it orders refunds. That's exactly the case here. That's exactly the situation. So what FERC has done here is completely different from what FERC does all the time when it looks at, when it initiates a 206 proceeding. Because any time, and we said in our brief another case, the WSPP case, where FERC went after the WSPP agreement and said things have to change in the WSPP agreement and they initiated a 206 proceeding and set a refund effective date, had any contracts been entered into after that refund effective date, FERC would have applied the ordinary just and reasonable standard just as it did in Westar because Westar had entered into contracts after the refund effective date. So what FERC is doing in this case, first of all, it's the first time anything like this has happened. It's the first time there's been a contract entered into after the complaint is filed where the Mobile Sierra presumption comes up. So as I said before, in answer to Judge McHugh, I'm sorry, Judge. Your way. I mean, it may be the first time, but that doesn't give us an answer to the question. What takes us out of Morgan Stanley? What takes us out of Morgan Stanley is that Morgan — this issue never arose in Morgan Stanley. What takes us out of Morgan Stanley is that the normal Mobile Sierra case, every case you see reported, every case that's ever been decided, the key issue is that the complaint was filed after the contract was entered into. Here, it's the reverse. The complaint was filed before the contract was entered into. And just as in Westar, what should have happened here is that the complaint gets filed, the refund effective date is set, any transactions entered into, including contracts, any transactions entered into after that refund effective date are subject to refund under the normal just and reasonable standard. That's the way FERC did it in Westar. That's the way it always does it. It just singled out this case to impose the Mobile Sierra presumption. And it didn't do it until you sent it back on remand. Okay. Thank you. Any further questions? Thank you. The case that's heard will be submitted for decision, and we'll proceed in argument on the second case on this morning's calendar, Idaho Power Company and Ida Corp versus FERC. Good morning, Your Honors. May it please the Court, I'm Lawrence Acker of Van Ness Feldman. I represent Idaho Power Company and Ida Corp Energy Services in the two petitions dealing with orders of the FERC that rejected salient portions of settlements that the companies had submitted to the Commission. Would you mind moving the microphone up just a little bit? Very good. Thank you. Certainly. Is that better? Yes. I've struggled with these cases because I've tried to – I can't reconcile what the Commission did in its orders respecting our settlements with all of the other orders that were issued in the case. FERC rejected the notion of there being a market-wide reset of prices when it set the matters for hearing after your remand. And that was the essential element of what's been referred to as ripple claims, which the Commission then wanted to preserve. The Commission found, before it ruled on our settlements, that virtually all of the contracts people entered into in the Pacific Northwest proceeding were governed by the Western Systems Power Pool Agreement. Oh, and by the way, if I may reserve three minutes for rebuttal, I'd forgotten. It found that all of the cases were subject to the WS – all of the contracts were subject to the WSPP agreement, and we submitted an affidavit in connection with our settlement that confirmed that all of Idaho Power's contracts were subject to the WSPP agreement. The Commission found that if you have a contract that's governed by the WSPP agreement, that the Mobile Sierra standard would apply. Once it made that finding, it was in the territory that when it had a contested settlement, it had the – it was required by its own rules and procedures to evaluate the contested settlement on the basis of challenges to material facts. The challengers to the settlements advanced no material facts in disputes, and under the Commission's paradigm, its rules, the Commission then had to evaluate that contested settlement on the basis of law and policy. While it had already decided that the law and policy was that there was no market-wide reset, essentially there would be no ripple claims, that – except in a remote hypothetical – Well, you say the market – there will be no market reset, but that question is still before the Commission, isn't it? The Commission could conclude that based on the factual presentations made, the Mobile Sierra presumption doesn't apply. It could conclude that, except it already had concluded at the time that it ruled on our settlement that the presumption did apply and there wouldn't be a market-wide reset. But it hasn't. Isn't it still on the table the possibility the Commission could conclude after the factual presentations that are made that the petitioners have made the case they need to make for Categories 2 and 3, as we were talking about it before, so that the presumption doesn't apply? Perhaps, but if it does that, it would be ruling – it would be changing its prior rulings. Well, you see, even the Commission isn't asserting that the door is bolted shut. The Commission, to the contrary, is arguing that all this evidence about bad faith is coming in, so the possibility remains that the Commission could decide that, although in theory Mobile Sierra applies based on the evidence presented, the presumption's been overcome and Mobile Sierra does not apply. And if that happens, why wouldn't the Commission want to leave the door open to revisit the settlement that you wanted it to approve? Because ultimately, when we deal with settlements, we are trying to resolve uncertainty. If we all knew the answer at the beginning of Chapter 1, there wouldn't be a need for settlements. The idea of settlements is to restrict all the litigation, to balance the needs of litigation against the practicalities of continuing commerce and continuing activity and moving ahead. We've been at this activity for almost 15 years, and the Commission has – and we went through an exercise, does anybody have any claims against Idaho power? There were a couple of cats and dogs, and we settled those. And now what we're left with is this intangible, hypothetical, speculative – these are all the Commission's characterizations of ripple claims. How they would want to keep the door open for things that it had essentially rejected in its earlier orders is – it's irreconcilable. It's not rational decision-making. The Commission set the ground rules for these cases and then decided our settlement on completely different grounds. It didn't make sense to me, and it doesn't make sense to me. As I say, if we knew what the outcome was going to be, there wouldn't be a desirability of settlement. Then the Commission decided at one point that the first of our two settlements was an uncontested settlement. Well, the only part that was uncontested, they approved. The part that was contested, they disputed, and they altered on the basis that the challengers challenged the settlement. Even though you struck a separate deal with the challengers, do you still want us to address that first issue? Sure, sure. We then made a deal that would resolve the challengers' positions. That then changed the analysis that the Commission is required under its rules to give a settlement that was clearly an uncontested settlement. Under uncontested settlements, the Commission is supposed to articulate how it's balancing the competing interests. It has a little bit more discretion than it does with a contested settlement. Here, it failed to articulate how it engaged in that balancing act between the competing interests under the trailblazer. One is to treat each of the two settlements separately, or should we recognize now that they're both on the table? Let me break that down.  It's not uncontested because you've knocked out the term that there was a dispute about. If we would send that back, I mean, do you want us to treat that separately and disregard the fact that you've now struck a deal with PowerX, the challenger? Do you want us to view the first one all by itself, or do you want us to view them both together and say we should treat them two together as an uncontested settlement? I think even when we filed the second petition, we had asked for them to be consolidated. They are inextricably linked, and we recognize that. We think you should send them both back. Their argument, it seems to be that, well, you can put the word contested on a piece of paper, but if it's illusory, it's not really contested. That's kind of how I boil their argument down. So they say that these Ripple claims are illusory. Do you agree with that? I think they're largely illusory. The theory that somebody is found to have committed an act of wrongdoing or charged rates that constitute an excessive burden could somehow be imputed to upstream sellers without taking into account individual conduct and the individual portfolios of sales. You can conjure up a remote hypothetical, but it's really unlikely. So you want us to take both petitions and treat them the same, not like in sequence? I think the decision-making of the commission, since in the second orders, the commission relies on its first orders and cites them as authority, I think they have to be considered together, really, in all candor. Or would you – if we agree with you, say, on Tacoma, then that has a ripple effect. I mean, that's a bad word here, but it has a ripple effect on the other settlement, right? So, I mean, is it a question of holding one in abeyance and finding out the answer, or is the answer the same in both? I think they just proceed in sequence. Because the second one, what the commission relied on as authority for its decision in the second one was its orders in the first one. I think if the first one falls, the second one falls, the second one could fall all on its own because there was certainly no opposition. One other thought that hadn't occurred to me in all candor until I was reading the commission's brief on my flight out here was that if you see fit to remand this case, this is not the most complicated case, and I think the court has the equitable jurisdiction to tell the commission, why don't you get back to us in 60 days and tell us if there's any reason why you can't decide this in short order. This is a settling case. This is not the prolonged litigation that is being considered for the other segment of the case. And as I say, I hadn't really noticed it. I kind of had a vague recollection of the Mobil Oil Corporation case that the commission cited from 1974, but as I read it and reread it, it seemed that the Supreme Court thought that you had very broad, equitable jurisdiction, and it's, I think, a little enough thing to ask for a relatively straightforward appeal. Thank you, counsel. Thank you. Good morning. Susanna Chu for the Federal Energy Regulatory Commission. Your Honors, with respect to these settlements, which I believe everyone agrees are indestructibly linked, nothing has changed in this case with respect to ripple claims. Idaho Power seems to believe that it is entitled to more than the benefit of its bargain with Tacoma and Power-X. To be clear, the commission's conditional approval of these settlements gave Idaho Power the benefit of its bargain with its counterparties. The transactions between Idaho Power and Tacoma, on the one hand, and Idaho Power and Power-X, on the other hand, are settled. But these ripple claims, there still is a possibility that they could arise, and the commission has said that they are speculative, but that's because ripple claims cannot arise until refunds are ordered. They are contingent on the issuance of a refund, and as you know, the proceedings are still ongoing. Nobody else stepped up to object to this settlement. So presumably the parties that would be adversely affected as a result of ripple claims didn't think it was important enough to say anything. Well, Your Honors, with respect to the Tacoma settlement, two parties had objected. But they've now been settled with. Right, that's right. And nobody else has stepped up in the context of either settlement. Right, beyond those two parties, no other parties have. So why isn't settlement a good thing? I mean, I can't help but be concerned that the position being taken by the commission is going to discourage settlements by parties, because you're basically saying, well, you can settle with the parties you settle with, but you're locked into this room forever. No, Your Honor, the commission absolutely wants to encourage settlements. So how does this not discourage settlements? I mean, if nobody else steps forward to say, hey, wait, I might get screwed because of this, then why should the commission prevent a party from getting out of the room? Well, the commission has approved the settlement between these parties, and I think that it's very reasonable to approve the settlement between the parties, because they're the ones who are able to settle their own transactions. But the commission has an independent obligation to consider whether a settlement is fair and reasonable and in the public interest, and this public interest consideration applies whether you call the settlement contested or uncontested. But there is a regulatory difference between contested and uncontested, right? There are. The provisions addressing settlements do have different provisions for contested versus uncontested, but the commission has substantial discretion in applying these rules. So in other words, if somebody says this is contested, the commission can say it's not really? Right. They can't say that? In the past, the commission has addressed certain settlements where there were objections, and it actually has addressed them as uncontested. So what's the authority to do that? How can you pretend that an objection doesn't exist? It's like saying, okay, well, it says objection or opponent's comments, and now we say, well, we recharacterize it as uncontested. Well, in Arctic Slope Regional Corporation versus FERC, 832 Fed 2nd 158, 1987 decision from the D.C. Circuit, the court affirmed commission orders that approved a settlement involving the Trans-Alaska Pipeline. There were objections, but the commission, in that case, found that the objections were really appropriately addressed at a later moment in time. Well, in this case, you've got twice there have been settlements presented to the commission, and the commission approved them while changing the terms, while striking a particular term. How can that not be deemed contested? I mean, if the commission changes what the parties propose to it, even if nobody else from the outside world comes in and complains, it's not rubber stamping what was put in front of them. Right. Well, the commission has substantial discretion, and with respect to... What can they call white-black? I mean, what is the meaning of uncontested in this world? This is the world where public utilities are non-governmental utilities, so maybe they can call white-black, but what does uncontested mean here? Well, with respect to the core of the settlement between the settling parties that are before the commission, those issues were not contested, and then the... How are we supposed to evaluate that on a petition for review? I mean, because basically there's no question they were contested, but you're saying, well, for this part they're not, and therefore we're going to recharacterize the whole transaction? Like there's a court proceeding or something. What's the support? You know, they basically modify, FERC modifies the agreement with Tacoma. So what is the authority we should look to that says, you know, FERC can do this, this is within FERC's authority? FERC has in the past done this, and in our case... That doesn't make it right. I'm asking, what's the authority to do it? The courts have recognized that FERC does have the authority to modify settlements in the interest of the public interest. And do so while calling it uncontested? Uncontested. Well, Your Honor, let me step back for a moment. I'm not really sure why Idaho Power believes it would be beneficial to evaluate the settlement under a contested standard versus an uncontested standard. The public interest is the same under either standard, and the contested settlement standard is a more stringent standard. It's more protective of contesting parties, but it doesn't benefit the settlement proponent. So, well, let's just take his hypothetical or like possible proposal. What if we agreed with him and said, you know, these did say contested, and you can't just change white to black and turn contested into uncontested. You've got to go back, and if they're contested, then you go under trailblazer. And if it's exactly the same as you're saying, then you could do that in 60 days, right? I don't believe it would take the commission very long to address the issue. I mean, the thing is, you know, under trailblazer, the threshold question is whether the settlement is in the public interest or not. And the commission has determined that settlements are not in the public interest. Trailblazer has some meaning. In other words, we don't divide contested and uncontested for no reason at all. You invoke trailblazer in a contested situation, right? Yes, because it's a heightened standard to protect the contesting parties, and it's a higher threshold for the settlement proponents to beat to prove that their settlement is just and reasonable. But trailblazer is basically a public interest plus standard. So what you're saying is that, in your view, the commission probably would come out the same, but it would be no problem if it were remanded for the commission to proceed under trailblazer. I don't believe it would take the commission very long to address that issue. But, again, I don't think that there would be any difference. And at the end of the day here, now that we're considering the two settlements together, no one's objecting. Right. That's right, Your Honor. I was just going to raise that issue that no one is – well, at this point, PowerX and PPL have had their issues carved out. They've had their own deals with Idaho Power.  Solely you're not approving it. Are you saying that the appeal is moot? It may be, Your Honor. Wait a minute. Apologies. The appeal of the first, the Tacoma settlement, solely the issue about whether that settlement should have been addressed under a higher standard, a higher contested settlement standard.  Trying to sort this out. I'm kind of driven to the big question. You tell us that FERC has the power, and properly so, to review any settlement for the public interest. What's the public interest here? Who is it that FERC is acting to protect in saying no to the settlements as they were offered to the commission? In the first instance, in the Tacoma settlement, PowerX complained. They've now struck a deal with PowerX. That complaint is presumably gone. So in the condition that we now have, who is the commission protecting? Right. Well, Your Honor, the commission has made very clear, and it's announced time and again throughout this proceeding, that RIPPLE claims are being preserved. Yeah, but whose claims are those? Who are those people? Well, as you know, this was a very active market in the Pacific Northwest, and on average electricity was traded on average six times between the point of generation to the ultimate wholesale purchaser in the chain. So in the event that the commission orders refunds, if the commission orders any party within this chain to pay refunds, there is a chance that that party could – Who is that party? Who are we talking about here? Any of the remaining parties in the case. None of whom filed any protest or challenge to this except PowerX, and they've now been taken care of. Well, understood, but there are other parties along the chain. We actually get to the point where they are ordered to pay refunds. I mean, I believe, Your Honor, their position is that they are not liable for refunds, and they also know that the commission has expressly preserved RIPPLE claims. And, in fact, all the parties, including Idaho Power, know that RIPPLE claims have been preserved by the commission. So that is – I understand Idaho Power's desire for finality. So basically it's sort of a hotel California settlement. You can check out any time you like, but you can never leave. With due respect, Your Honor, it's not the intention of the commission to not allow parties out of the room. But isn't that exactly what's happened here? The commission has given this party the full benefit of its bargain, and there is no – there are no other settlements. The commission has approved many settlements in this case, in this proceeding. None of them, as far as I know, have purported to strike third parties' RIPPLE claims and to preclude the commission from even considering such RIPPLE claims. So the commission's decisions with respect to Idaho Power are perfectly consistent with all of the decisions it's issued on settlements in this proceeding. Okay. Further questions? Thank you. We'll give you three minutes. Thank you. Why don't you tell us what you want and get out of this whole thing in light of the argument made? Or your client, I should say. In a nutshell, that's exactly – I want to get out of this thing. So do we. So how do we accomplish that? Well, actually, if we had approval of a settlement like this, which is what I think – if you see fit to remand this to the commission and they act on it and reconsider it, and they reconsider it in light of the fact that this is not a set of one-way releases that Idaho Power sought from the market. It's a series of mutual releases, and that's what the provisions of the settlement say. We will forego all claims against the other parties. They will forego all claims against us. All of the other parties. All of the other – I'm sorry. Just Tacoma and Power X or everybody else that's in the room? Everybody else in the room. The settlement provisions actually spoke in terms of a series of mutual releases, not one-way releases. It wasn't just that other parties were waiving claims against us. We agreed that we would waive claims against all the other parties. If the commission approved that kind of settlement, my conjecture – and I've been doing this case now for a decade and a half – is that it would be the model for a host of other settlements, and most of the dust in the Pacific Northwest cases would settle. But what you were asking earlier is that, well, as I understood it, you're basically saying that the commission didn't follow its rules and therefore we would remand and they would follow its rules even if they came out the same given 60 days to do it. I think if it followed its rules, it's unlikely that this would come out the same. Under the Trailblazer standard, there are four stages that they go through analytically. Under the uncontested standard, they have more discretion, but it's not untrammeled discretion. They have to articulate how they go about balancing the – So let me just ask you this. Let's just say your wish were granted and you got to go back, and within 60 days they said, okay, now we applied Trailblazers. The first component is basically the same public interest, and then we checked through the other three and we come out exactly the same. Are you going to be right back here? If they do a good and cogent analytical job and concluded that the settlement should be rejected, I'd have to evaluate it on the basis of what kind of job they did. We didn't launch these appeals just because they ruled against us. We initiated these appeals because they ruled against us in what we thought was an indefensible fashion. Okay. They just told us, or the Commission's counsel has told us, that there have been lots of other settlements. The other settlements don't entail the kind of complete peace that you're seeking to get out of the room, the mutual releases with all other parties. It's one thing to say you've got mutual releases with parties you've contracted with, Tacoma, Power X, but you're apparently seeking releases from everybody else, just as you're willing to say, and we won't pursue them. Have other settlements that have been approved by the Commission contained that term? No, because all of the other settlements in the Pacific Northwest cases came after the Commission ruled on the Ida Corps, the first of the Ida Corps settlements, the Idaho Power settlements, and so the parties, my surmise and, frankly, my knowledge, they concluded that it was pointless to try and present a broader settlement to the Commission unless the Commission changed its mind about broader settlements. So you're seeking a complete peace that nobody else has gotten? Nobody else has tried to get. But they've settled on terms that acceded to the fact that they're locked into the room? Yes. Thank you for your consideration. Thank you for your arguments. The case is heard and will be submitted for decision, and we'll be in recess for the morning. All rise. We'll be in recess.
judges: Thomas, McKeown, Clifton